**Walter JOHNSON, individually and as Secretary-Treasurer of Department Store Employees Union, Local 1100, etc., et al., Appellants,**

v.

**John M. ENGLAND, C. E. Strobel and Walter J. Hempy, as Trustees in Bankruptcy of the Estate of Raphael Weill & Co., Inc., a bankrupt, Appellees.**

No. 20087.

United States Court of Appeals Ninth Circuit.

Jan. 12, 1966.

Roland C. Davis, of Carroll, Davis, Burdick & McDonough, San Francisco, Cal., for appellants.

Edward R. Steefel, of Dinkelspiel & Dinkelspiel, Pillsbury, Madison & Sutro, James M. Conners, San Francisco, Cal., for appellees.

Before CHAMBERS, POPE and KOELSCH, Circuit Judges.

POPE, Circuit Judge.

This proceeding was commenced in the Superior Court of the State of California by the appellants as plaintiffs against the defendant Raphael Weill & Company, Inc., which operated the White House department store in the City of San Francisco. It was subsequently removed to the above named district court upon the application of the appellees. That court vacated and dissolved orders of the State court directing arbitration of certain disputes alleged to exist between plaintiffs and Raphael Weill & Company (herein called White House) requiring the operators of White House to deposit the sum of $158,000 in court, pending the arbitration award, and temporarily enjoining defendants from transferring such sum. This is an appeal from the order so vacating and dissolving such State court orders.

The action in the State court was commenced by the filing of a "Petition for Order Directing that Arbitration Proceed and Complaint for Injunctive Relief Pending Arbitration Award." It alleged that the appellants, as petitioners, represented a local union of department store employees which had a collective bargaining agreement with White House which, among other things, provided for arbitration. Appellants alleged that controversies had arisen between the union and the employer arising out of the terms of the said collective bargaining agreement; that the employer had informed the petitioners that it would probably go out of business and sell its assets; that the union had demanded that the controversies referred to be submitted to arbitration and that the employer had refused. Plaintiffs alleged that the amount of money involved in the arbitration of the controversies was $158,000; that the termination of the business would operate to dissipate all assets of White House and render ineffective and futile any arbitration award to the union; that therefore the employer should be ordered to deposit said sum of money with the court and should be enjoined from disposing of or transferring any of such sums pending the arbitration award. The prayer was for an order directing that such arbitration proceed in the manner provided for in the collective bargaining agreement and for an order requiring deposit of the sum mentioned and for an injunction against transferring or dissipating that sum.

It appears from copies of letters attached to and made a part of the petition and from affidavits filed in support of the petition that the controversy concerning which the appellant had demanded arbitration concerned the failure of White House to provide a fund for the payment of pensions as required by the collective bargaining agreement. The record here shows without contradiction or controversy that in 1960 White House entered into a trust agreement with the Bank of America purporting to establish a fund for the payment of pension benefits to employees represented by the labor organization under their collective bargaining agreement. However, only $1115.89 had been contributed to the

fund by White House since the fund was established through such trust agreement. Unless White House makes additional substantial contributions to that fund, many of the employees entitled to pensions will not receive them.

Upon the filing of the petition on January 27, 1965, the Superior Court issued a temporary restraining order restraining White House from disposing of or dissipating said assets below the level of $158,000. An order to show cause was issued requiring the defendant to show cause on February 9, 1965, why an injunction should not be issued as prayed for and an order requiring the depositing of said sum should not be made.

On February 3, 1965, White House filed a voluntary petition in bankruptcy in the same district court to which appellants' case had been removed; it subsequently was adjudicated a bankrupt and a receiver was appointed. On February 8, 1965, that court entered an order enjoining the prosecution of suits against the bankrupt. However, on the following day counsel for appellants presented to the State court their application for an order requiring arbitration and for a preliminary injunction, although the order of the district court enjoining the prosecution of suits against the bankrupt was made a part of the record of that court. Counsel for the receiver for the bankrupt appeared and objected to the jurisdiction of the Superior Court but on February 11, 1965 it entered an order directing arbitration and granting a preliminary injunction and requiring the deposit in court of the $158,000 pending the arbitration award or further order of the court.

On petition of the defendant White House the cause was removed as above stated to the court below. The appellants filed a motion to remand which was denied. White House, and its trustees in bankruptcy, who had intervened, moved to dissolve the orders of the Superior Court. After hearing that motion was granted on March 23, 1965, and all the state court orders referred to were dissolved and set aside. This appeal followed.[1]

Two principal questions are presented. The first one relates to the merits of the appellants' claim that as a labor organization representing employees in an industry affecting commerce, it is entitled to an order from a state or federal court enforcing a collective bargaining contract providing for arbitration of disputes arising thereunder notwithstanding the bankruptcy and cessation of business of the employer. The second question is whether the suit instituted in the state court, as above described, was properly removed to the federal district court. As the last stated question is basic to the jurisdiction of the court below and to our right to review the order of that court, we shall first address ourselves to that question.

It is plain that the motion to remand in this case was denied upon the ground that the district court had orig-

---

1. Appellants' brief states that this court's jurisdiction "rests upon 28 U.S.C. § 1291" and appellees do not question that. The appeal is from the order dissolving the Superior Court's "Order Directing Arbitration to Proceed and for Preliminary Injunction." That order, after directing that such Superior Court order "is hereby dissolved", recites: "It is further ordered, that further proceedings herein are stayed until further order of this Court." This language suggests a problem as to the finality of the order. We need not consider whether the order is appealable under § 1291 as disposing of a collateral issue where failure to entertain the present appeal would result in irreparable loss of substantial rights of the appellant, within the rule discussed in United States v. Wood, 5 cir., 295 F.2d 772, 777–778, and in cases there cited. For here the appeal, being from an order dissolving a temporary injunction, is appealable under 28 U.S.C. § 1292 and the appeal carries with it to us the power to consider and decide the merits of the whole case, under the rule of Smith v. Vulcan Iron Works, 165 U.S. 518, 525, 17 S.Ct. 407, 41 L.Ed. 810, followed in Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 52–53, 58 S.Ct. 459, 82 L.Ed. 638, and in Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189.

inal jurisdiction under § 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)) of a suit claiming violation of a labor contract between an employer and a labor organization representing employees in an industry affecting commerce, and seeking enforcement of an agreement for arbitration of disputes thereunder. See Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. If that be so then the action was removable under the provisions of Title 28 U.S.C. § 1441(b) providing for the removal of "any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States * * *."

Both parties concede that White House was an "industry affecting commerce" as that term is used in § 301.[2]

Appellants assert that the case as filed in the state court was not a case "arising under" § 301(a) of the Labor Management Relations Act or any other law of the United States so as to permit removal under the section referred to. Says the appellant: "[T]he petition and complaint in the state court was cast solely on a state created right to bring suit for violation of a collective bargaining agreement and sought only a remedy under state law." Appellants further assert that the denial of remand deprived them of a right "to cast their action on state-created rights rather than on rights available under federal law, to-wit, § 301 (a)."

We cannot accept this argument in view of the decisions of the Supreme Court in [Local 174, Teamsters, etc.] Teamsters Local v. Lucas Flour Company, 369 U.S. 95, 102–103, 82 S.Ct. 571, 7 L.Ed.2d 593, and Republic Steel v. Maddox, 379 U.S. 650, 657, 85 S.Ct. 614, 13 L.Ed.2d 580. When the first of these cases was decided it had been held in Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483, that a suit to enforce § 301(a) of the Labor Management Relations Act, could be brought in a state court as well as in a federal district court. The Lucas Flour case, supra, was one brought in a court of the State of Washington to recover damages for violation of a collective bargaining agreement which provided for arbitration of differences which might arise between the employer and the employee. In affirming the judgment of the lower court the Supreme Court of the State held that § 301 could not "reasonably be intepreted as pre-empting state jurisdiction, or as affecting it by limiting the substantive law to be applied." The court expressly based its decision solely upon state law. Upon review of that decision, the United States Supreme Court posed the question: "Was the Washington court free, as it thought, to decide this controversy within the limited horizon of its local law?" The Supreme Court said: "In Dowd Box we proceeded upon the hypothesis that state courts would apply federal law in exercising jurisdiction over litigation within the purview of § 301(a), although in that case there was no claim of any variance in relevant legal principles as between the federal law and that of Massachusetts. In the present case, by contrast, the Washington court held that there was nothing in § 301 'limiting the substantive law to be applied,' and the court accordingly proceeded to dispose of this litigation exclusively in terms of local contract law. The union insists that the case was one to be decided by reference to federal law, and that under applicable principles of national labor law the strike was not a violation of the collective bargaining contract. We hold that in a case such as this, incompatible doctrines of local law must give way to principles of federal

2. See for example the statement in appellants' brief quoted in footnote 5, infra, which alludes to the "national labor policy favoring arbitration as the preferred method of resolving disputes arising under collective bargaining contracts has been manifested by Congress." The petition for removal alleged that the suit concerned a contract "in an industry affecting commerce" and the motion to remand, and brief in support thereof, did not question this.

labor law. * * * The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute. Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of Lincoln Mills, requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy. More important, the subject matter of § 301(a) 'is peculiarly one that calls for uniform law.' "

In Republic Steel v. Maddox, supra, the employee sued his employer in the state court seeking recovery of severance pay under the terms of a collective bargaining agreement between the employer and the employees' union. A claim by the employer that the employee should not recover because of his failure to employ contract grievance procedures before suit was rejected on the ground that state law governed the suit. A judgment of the state Supreme Court was reversed on the authority of the Lucas Flour case, supra, the court saying that no positive reasons appeared why the federal general rules should not apply, holding that federal law covered the suit which must be deemed to be one under § 301(a).

■ It must therefore be held that since in effect § 301(a) operated to preempt this field of law, a fair construction of the complaint here filed must be that it is necessarily one pursuant to § 301(a) and not to be distinguished from the complaint in the Dowd Box case. It

follows that this case was properly removable to the federal district court.[3]

Since we hold that the district court obtained jurisdiction of the cause through removal, we come next to the inquiry whether that court did properly decide the case by dissolving the orders of the California Superior Court.

The appellants here of course acknowledge that § 70 of the Bankruptcy Act (Title 11 U.S.C. § 110) provides that the trustee in bankruptcy shall be "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title * * *." And appellant is aware of § 2 of the Bankruptcy Act (Title 11 U.S.C. § 11) which authorizes the Bankruptcy Court to cause the estates of bankrupts to be collected, reduced to money and distributed, to determine controversies in relation thereto, and to allow and disallow claims against the bankrupt's estate.[4]

What the appellants argue is that we are dealing here with a suit to compel arbitration; that such suits have attained in the process of formulation of federal labor law such an important status that they must be permitted to continue in the court in which instituted despite the filing of bankruptcy proceedings, and regardless of whether the business of the employer defendant has come to an end or not. In support of this assertion appellants cite Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912; United Steel-

---

3. See Wright "Federal Courts" § 20, p. 58: "In the Lincoln Mills case a majority of the Supreme Court read § 301 as requiring the federal courts, in such cases, to fashion and apply a federal common law of labor-management contracts. Though this interpretation poses its own difficulties, it obviates any jurisdictional problem, since federal law then provides both the right and the remedy, and the case is one of true federal question jurisdiction."

4. See Ex Parte Baldwin, 291 U.S. 610, 615, 54 S.Ct. 551, 553, 78 L.Ed. 1020: '"All property in the possession of a bankrupt of which he claims the ownership passes,

upon the filing of a petition in bankruptcy, into the custody of the court of bankruptcy. To protect its jurisdiction from interference, that court may issue an injunction. The power is not peculiar to bankruptcy or to the federal courts. It is an application of the general principle that, where a court of competent jurisdiction has, through its officers, taken property into its possession, the property is thereby withdrawn from the jurisdiction of other courts. Having possession, the court may not only issue all writs necessary to protect its possession from physical interference, but is entitled to determine all questions respecting the same."

workers of America, AFL–CIO v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise, etc. Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed. 2d 1424; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, and Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320. Appellants' conclusion from this argument is stated as follows: "It must be concluded that suits to compel arbitration, such as in the instant case, are to be accorded a primary status over bankruptcy proceedings similar to that accorded to the NL RB, if federal labor policy is to be fully effectuated." [5]

■■ It is clear that in dealing with unfair labor practices the National Labor Relations Board may issue an appropriate cease and desist order against a corporate employer even though it is in the process of liquidation and is being operated through a receiver. The cease and desist order cannot be avoided by a mere reorganization, particularly where the concern is to be reorganized with the respondent retaining an interest. Such was the holding in National Labor Relations Board v. Coal Creek Coal Co., 10 cir., 204 F.2d 579, which is a case upon which appellants place much reliance. That case, however, makes a distinction which we think is a proper one. The court there dealt with a receivership under which the business would be carried on by the receiver. It noted the difference between the type of receivership before it and an ordinary bankruptcy where the business would come to a complete end and where all the assets would be liquidated and distributed. Said the court: (p. 580) "If, as suggested (and apparently conceded in reply brief) the assets of the Company are to be sold and liquidated and all interest of the respondent therein extinguished, the questions of unfair labor practices and domination are of course moot. But the order of the Board is directed against the respondent, * * * and if the respondent is to be operated through a receiver, or reorganized with respondent retaining an interest, either proprietary or managerial, the order of the Board with respect to the conceded unfair labor practices will be enforced, for such responsibility cannot be avoided by reorganizations, transfers or any other 'disguised continuance.' "

The appellants have not called to our attention any case holding that ordinary bankruptcy proceedings should be suspended to permit a processing of complaints before the Labor Board, much less suspended to permit prosecution of suits for arbitration under § 301(a).[6]

---

5. Appellants also set forth their proposition in the following language: "It must be concluded that these important employee rights, including the right of arbitration under a collective bargaining contract, which have been recognized by the Courts as surviving the termination of an employer's operations, may not be destroyed merely because an employer files a voluntary petition in bankruptcy. The national labor policy favoring arbitration as the preferred method of resolving disputes arising under collective bargaining contracts has been manifested by Congress, and this intent of Congress has been respected and enforced by the Courts."

6. In support of their position appellants cite in addition to the Coal Creek Coal Co. case, supra, National Labor Relations Board v. Baldwin L. Works, 3 cir., 128 F.2d 39, and In re American Buslines,

D.Neb., 151 F.Supp. 877. None of these involved any clash between bankruptcy proceedings and suits under § 301(a). They all involved proceedings before the Labor Board. In the Baldwin Works case, the respondent corporation was involved in a reorganization proceeding under § 77B of the Bankruptcy Act, 11 U.S.C. § 207. In that case the corporation's executive personnel and management remained in charge while the company was a debtor in possession. The business was continued in susbtantially the same manner as prior to the reorganization proceedings. In the American Buslines case, supra, a corporation was being reorganized under Chapter X of the Bankruptcy Act and the debtor and its trustee were continuing operations of the business. It was held that the court in the proceeding for reorganization would not enjoin the prosecution of the representation proceedings.

On the other hand, the case of In Re Muskegon Motor Specialties Co., 6 cir., 313 F.2d 841, cert. den. International Union, United Auto., etc. v. Davis, 375 U.S. 832, 84 S.Ct. 51, 11 L.Ed.2d 63, is an authority directly opposed to the contentions of the appellant. While that case involved a debtor in reorganization proceedings, it appears that the debtor was defunct. It had gone out of business, discharged all of its employees and disposed of its plant and equipment. The union which had represented the former employees claimed vacation pay for the employees for a period which extended past and beyond the date of the termination of the business of the employer. The employer refused to accede to this claim. The union demanded arbitration of grievances and then proceeded to file suit in the district court to compel arbitration. The demand was rejected.[7]

Appellants assert that Muskegon Motor is inconsistent with Republic Steel v. Maddox, supra. The Maddox case presents no such question. There the plant where Maddox was employed closed, but the employer continued its business generally.

■■ Appellants' argument here is based entirely upon their interpretation of what they describe as a federal policy favoring arbitration of labor disputes. It seems plain that we have here something quite different from the ordinary or typical labor dispute which is appropriately resolved by arbitration. In order to see this, it will help to characterize the relevant relationships. First, it seems clear that the Superior Court of California was not enforcing a trust. The collective bargaining agreement directed that the employer should provide pensions for retired employees and that the employer should make contributions to the retirement plan in amounts actuarially determined to be sufficient "to fund over such period of years as the employer may determine, the retired benefits. * * *" In accordance with this provision the White House entered into an agreement of trust with Bank of America as trustee. However, White House failed to provide this fund except to the extent of $1115.89. No further contribution was ever made. There is no dispute here between the parties as to the existence of a trust claim on the part of the employees or their unions for the $1115.89. There existed no trust, however, with respect to any other sum. As to the other amounts which the White House should have paid or contributed, the relation between the employees and the White House was merely one of debtor and creditor. As stated in Scott on Trusts, 2nd ed., vol. 1, § 26.5: "Where a person promises to transfer property to another as trustee at some time in the future, a trust of the property does not arise until he makes the promised transfer." [8]

---

**7.** In that case the union made substantially the same argument that appellant presents here. It argued: "Clear federal policy favored arbitration of labor disputes and this constituted such an exceptional circumstance as required the bankruptcy court to surrender its jurisdiction to arbitration." (313 F.2d p. 842) The union relied upon the same cases which the appellant cites here, as above stated. The court there distinguished the cases in which a bankruptcy court has because of exceptional circumstances surrendered jurisdiction, and said (p. 843): "The employer was out of business and had no plant or employees. The collective bargaining agreement had expired on April 14, 1961. Whatever rights the employees had for vacation pay under the collective bargaining agreement had already become fixed. All that remained was a question of law which, it seems to us, could better be passed on by the court rather than an arbitrator. This case does not involve working conditions or practices in a shop, but the law of the land."

**8.** See Restatement of the Law of Trusts, Second, § 26: "A manifestation of intention to create a trust inter vivos at some time subsequent to the time of the manifestation does not create a trust." And see illustrations 13 and 14 as follows: "13. A and B enter into a written agreement whereby in consideration of B's marrying A, A promises within one year to set aside $10,000 and to hold the money in trust for B. Although no trust arises

There can be no question that in consequence of all this White House had breached its contract to pay money into a pension fund. But the result was merely that the employees became creditors to the extent of that default, and the relation between the employees and White House in this connection was merely that of debtor and creditor.

The controversy which now arises is between two groups of creditors of White House. On the one hand we have the employees and on the other we have the other general creditors such as creditors for merchandise sold. This does not present the type of grievance which is ordinarily the subject of arbitration under a collective bargaining agreement enforced pursuant to § 301(a). Such controversies usually involve disputes between the union and the current operating employer and are generally of such character that they lend themselves most readily to solution through arbitration. In that type of case the arbitrators "sit to settle disputes at the plant level—disputes that require for their solution knowledge of the customs and practices of a particular factory or of a particular industry as reflected in particular agreements." United Steelworkers of America v. Enterprise, etc., Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360.

A decision of an arbitrator here would involve interests of parties who never consented to arbitration, namely, the trustee in bankruptcy and the general creditors. They ought not to be bound by the decision of an arbitrator selected by the employer and the union. The issues here are within the special competence of a bankruptcy court.

Furthermore, if appellants had their way and arbitrators were put in a position to decide, and did decide that the $158,000 were trust funds, or that appellants should be allowed preference, such a decision would not be subject to full judicial review in any court, (see United Steelworkers of America v. Warrior & Gulf Co., 363 U.S. 574, 80 S.Ct. 1347). That ought not to happen to these general creditors.

Appellants' claim is that the national labor policy favoring arbitration requires that a suit under § 301(a) to enforce arbitration may be maintained notwithstanding the bankruptcy of the employer and the complete termination of its business, and notwithstanding the fact that the dispute concerns the allocation of corporate funds. The Supreme Court dealt with a similar claim in Nathanson v. National Labor Relations Board, 344 U.S. 25, 28, 73 S.Ct. 80, 83, 97 L.Ed. 23. There it was argued that the interest of the United States in eradicating unfair labor practices was so great that a labor board's back pay order should be granted priority of payment against a bankrupt employer. Said the Court: "Whether that should be done is a legislative decision."[9] Suffice it to say that we do not feel it to be proper for us to make what is essentially a legislative decision with respect to appellants' claim here.

The claim of the employees or of the union as creditors of White House remains unliquidated. The Bankruptcy Act provides adequate machinery for the as-

---

until A sets aside the money, A is liable for breach of contract if he fails to create the trust, since his promise was made for consideration.
14. A and B, husband and wife, enter into a separation agreement, whereby A agrees within a year to transfer to a trustee to be chosen by them securities of the value of $100,000 to be held in trust for B. Although no trust of the securities arises until A transfers them to the trustees, A is liable for breach of contract if he fails to create the trust, since his promise was made for consideration."

9. In Nathanson the Board's order requiring payment of back pay to the employees had been completed prior to the filing of the petition in bankruptcy against the employer. There was no necessity for a suspension of bankruptcy proceedings pending a completion of the board's hearing. The court held the board to be a creditor within the meaning of the Bankruptcy Act for the purpose of collecting through the bankruptcy court procedures the amount or back pay awarded.

52

certainment of the amount of the claim and for its liquidation. § 26 of the Act (Title 11 U.S.C. § 49) provides an appropriate method for the determination of the amount of the employees' claims through arbitration. Such an arbitration concerning the amount of the claim is quite appropriate. A submission to arbitration of the questions sought to be raised in the appellants' suit in the court below, such as the existence of a trust or of the preference of appellants' claims as against other creditors of the bankrupt, would appear to us to be inappropriate.

 There are other reasons why we think the action of the court below was proper. It was shown in support of the motion to dissolve the Superior Court's orders that on the 8th of February, 1965, the district court in the matter of the bankruptcy of White House made an order enjoining and staying actions against the bankrupt. It happened that the order for a stay of such cases, made pursuant to § 11 of the Act (Title 11 U.S.C. § 29) was made by the same judge who entered the decision here appealed from. But even if these orders had been made by different judges of the district court, it would have been improper for the judge acting on the application to dissolve the orders made by the California Superior Court to decline to follow the prior order staying actions against the bankrupt. See TCF Film Corporation v. Gourley, 3d cir., 240 F.2d 711, 713; Hardy v. North Butte Mining Co., 9 cir., 22 F.2d 62. The order enjoining and staying actions against the bankrupt made on February 8, 1965 was an order made "in the proceedings in bankruptcy" and was appealable. Bankruptcy Act § 24 (Title 11 U.S.C. § 47). If the appellants were aggrieved, it was by this order staying actions from which an appeal was not taken.

In any event the attempt to impound $158,000 by means of an injunction must fail. Assuming the court below might entertain a suit under § 301(a) to enforce arbitration, the ultimate result of such a proceeding could at best be an award of money damages. The $158,000

was undoubtedly part of the general assets of White House. It is not shown to be a trust fund. The injunction issued in the Superior Court was rightly dissolved for this further reason. An injunction is wholly inappropriate in a suit for money.

The decision of the district court is affirmed.