In re CONTINENTAL AIRLINES COR-PORATION, Continental Air Lines, Inc., Texas International Airlines, Inc., TXIA Holdings Corporation, Debtors.

Bankruptcy Nos. 83–04019–H2–5, 83–04020–H1–5, 83–04021–H3–5 and 83–04022–H3–5.

United States Bankruptcy Court, S.D. Texas. Houston Division.

April 11, 1986.

John J. Gallagher, Joel M. Cohn, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Continental.

John O'B. Clarke, Jr., William J. Birney, Thomas P. Murphy, Highsaw & Mahoney, Washington, D.C., Jeffrey P. Manners, Houston, Tex., for International Ass'n of Machinists and Aerospace Workers.

Myron M. Sheinfeld, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., Harvey Miller, Bruce Zirinsky, Weil, Gotshal & Manges, New York City, for Continental Air Lines, Inc. and Texas Intern. Airlines, Inc.

Claude D. Montgomery, Booth, Marcus & Pierce, New York City, for Official Union Labor and Pension Creditors' Committee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS' CLAIM FOR LABOR PROTECTIVE PROVISIONS BENEFITS

T. GLOVER ROBERTS, Bankruptcy Judge.

The following are facts either stipulated or established by the evidentiary record in this case in previous matters, of which the Court takes notice, and is considered a proper and adequate basis, on which to make these "Findings" and "Conclusions".

### FINDINGS OF FACT

**A. Background**

1. The Civil Aeronautics Board ("CAB") imposed labor protective provisions ("LPP") on August 14, 1981 in conjunction with its approval of the acquisition of Continental Air Lines by Texas International Airlines and Texas Air Corporation. CAB Order No. 81–10–66 (Aug. 14, 1981). Section 1 of the LPPs states:

> The fundamental scope and purpose of the conditions hereinafter specified are to provide for compensatory allowances to employees who may be affected by the proposed acquisition by Texas International Airlines, Inc. (TI) of Continental Air Lines, Inc. approved by the attached order, and it is the intent that such conditions are to be restricted to those changes in employment due to and resulting from such acquisition. Fluctuations, rises and falls, and changes in volume or character of employment brought about by other causes are not covered by or intended to be covered by these provisions.

The LPPs provided three basic types of compensation for changes in employment "due to and resulting from" the acquisi-

tion: (1) a displacement allowance for those employees who received lower compensation; (2) a dismissal allowance for those employees whose jobs were abolished; and (3) relocation expenses for those employees who were forced to move.

2. Texas International and Texas Air consumated their acquisition of Continental on November 30, 1981. During 1982, Continental and Texas International began to integrate their operations. On October 31, 1982 the two carriers implemented a corporate reorganization and were operationally merged under the name Continental. The employees, routes, flight schedules, and fleets were combined as one operation. The employees in each craft were combined under the representation of single unions. Continental prepared and distributed to its employees an employee handbook explaining the availability of LPP benefits. Several IAM employees who were adversely affected by the merger subsequently applied for and received the prescribed LPP benefits following the merger.

3. On April 30, 1985, the International Association of Machinists and Aerospace Workers ("IAM") filed a claim against the Debtors in the amount of $917,376,165. Paragraph 6 of this claim seeks LPP benefits in the amount of $312,000,000 on the ground that Continental's closing of its flight kitchens and cabin cleaning stations, and subcontracting of this and fueling service work on August 13, 1983, were directly caused by the 1981 acquisition of Continental by Texas International and Texas Air. Consequently, the IAM claims that those employees who were furloughed on August 13 as a result of the above transactions are entitled to LPP benefits under the CAB's August 1981 Order.

**B. Continental's Flight Kitchen and Cabin Cleaning Operations**

4. Continental operated three flight kitchens in Houston, Los Angeles, and Denver and seven cabin cleaning stations prior to its October 1982 operational merger with TXI. Findings of Fact and Conclusions of Law on the Debtors' Motion to Reject Collective Bargaining Agreements Relating to Mechanics and Related Employees Findings at 4 (¶ 8) ("Findings"). TXI did not operate flight kitchens, but did maintain seven cabin cleaning stations. Id.; Affidavit of Herbert J. Siebert at ¶ 3 ("Siebert Aff."). However, Houston and Denver were the only two locations where both Continental and TI provided cabin cleaning service.

Continental's flight kitchens catered flights with food and beverage items. The Continental and TXI cabin cleaning operations performed similar functions in the cleaning of aircraft interiors. Findings at 4 (¶ 8). Unlike mechanical repair work on aircraft and engines which is generally performed by skilled mechanics pursuant to FAA regulations, the flight kitchen and cabin cleaning functions, in contrast, generally required little, if any, technical skill. Findings at 74; 8 (¶ 21).

**C. Airline Deregulation Adversely Affected Continental's Pre-Merger Financial Condition**

5. Beginning in 1979, three years *before* its operational merger with Texas International, Continental began to experience substantial financial losses which this Court expressly found

> [W]ere caused primarily by Continental's inability to compete with new entrants coming into the airline industry [following deregulation of the airline industry in 1978]. The principal reason for its inability to compete was that its labor costs were significantly higher than the new entrants.

Findings of Fact and Conclusions of Law Relating to the Rejection of the Collective Bargaining Agreements with ALPA at ¶ 6 (Aug. 17, 1984). Thus Continental (and Texas International when considered on a combined basis) lost $27.4 million in 1979, $76.8 million in 1980, $138.6 million in 1981, and $119.9 million in 1982. *Id.; In re Continental Airlines Corporation*, 38 B.R. 67, 69 (Bankr.S.D.Tex.1984).

6. In a September 1982 formal Civil Aeronautics Board filing pursuant to

§ 43(g) of the Airline Deregulation Act of 1978 49 U.S.C. § 1552(g), the IAM conceded that Continental's substantial losses in 1979–1981 were the direct result of airline deregulation. Answer of International Association of Machinists and Aerospace Workers to Applications for Determinations of Qualifying Dislocations (Sept. 7, 1982).

7. Two areas which had a significant adverse cost impact were Continental's flight kitchen and cabin cleaning service operations. Specifically, as this Court found, the provisions of the IAM contracts "relating to flight kitchen and cabin cleaning operations ... required Continental to pay skilled wage rates to relatively unskilled employees performing operations not requiring a skill." Findings at 74. Further, the Court found that these contract provisions:

[C]ontain terms which provide for inflexibility and inefficiency of operation and which are clearly onerous and burdensome. Continental could not compete in the existing market place if it had to continue to pay compensation so substantially in excess of its effective competition.... [T]he wage rates and working condition provisions pertaining to [Continental's flight kitchen and cabin cleaning] operations were materially in excess of those commanded by the market place.

*Id.*

**D. Pre-Merger Negotiations**

8. Continental and the IAM executed a collective bargaining agreement on September 13, 1979. Findings at 2 (¶ 5). Pursuant to Section 6 of the Railway Labor Act ("RLA"), 45 U.S.C. § 156, Continental and the IAM exchanged notices of proposed

changes ("opener") in the Continental-IAM agreement on September 21, 1981.[1] Findings at 2 (¶ 4), 4 (¶ 9). These openers were prepared and exchanged by prior management prior to the acquisition and merger.

Continental's 1981 opener contained numerous proposals designed to reduce substantially Continental's high labor costs. Siebert Aff. at ¶ 4; *see* Findings at 5 (¶ 14). For example, Continental proposed modifying the Scope Article to include a new paragraph:

Further, the Company reserves the right to create, delete or relocate any and all work in classifications covered by this Agreement existing or future stations served by the Company.

Ex. 5414.[2] Continental further proposed that the parties:

Establish a procedure to close the Flight Kitchens and relocate the current active employees to positions within the Company.

Findings at 64; Ex. 5414.

9. Continental's September 1981 proposal to close its flight kitchens was not, however, the first time that this cost reduction proposal had been presented to the IAM. Continental had proposed closing its kitchens in an effort to reduce its high labor costs in *all* contract negotiations with the IAM since 1971. Siebert Aff. at ¶ 6.

10. Continental operated four flight kitchens until May 1980 when the IAM agreed to allow Continental to close its Chicago flight kitchen. Siebert Aff. at ¶ 6. Continental decided to close this kitchen because of reduced flight activity into Chicago. *Id.* Continental considered keeping the Chicago kitchen open by entering into contracts for catering services with other

---

**1.** Section 6 provides for notice of intended change in agreement, and prevents change in "rates of pay, rules, or working conditions ... until the controversy has been finally acted upon as required by Section 5 of this Act, by the [National] Mediation Board ..." 45 U.S.C. § 156.

**2.** Work rules defined by the "Scope Article" had the greatest adverse impact on productively by restricting Continental's ability to operate in the

most efficient and economical manner. Siebert Aff. at ¶ 5. For example, the Scope Article prevented Continental from closing flight kitchens and cabin cleaning stations once they had been opened unless the Company discontinued all flight operations to that location. *Id.* Continental's 1981 proposal would have permitted the Company to close its flight kitchens and cabin cleaning stations without the consent of the IAM. *Id.* at ¶ 4.

carriers; however, the Company was unable to secure any such contracts due to its high kitchen labor costs which prevented Continental from competing effectively with airline catering companies which had significantly lower labor costs. *Id.;* Findings at 10 (¶ 29).

### E. The Merger Had A Positive Effect On IAM Employment Levels

11. Several months prior to the operational merger, Continental and the IAM agreed in May 1982 that:

> Should [Continental] reach an agreement with Texas International Airlines to provide catering services on certain Texas International DC-9 flights by using current IAM represented employees and subsequently decides to cancel that service, the Union agrees that such a decision would not be a violation of the [Scope Article] of the current working agreement.

Siebert Aff. at ¶ 7. Continental was desirous of this agreement because it "permit[ted] the Company to create jobs by providing a service which generate profits." *Id.* Shortly thereafter Continental began to cater Texas International flights in Denver, Houston, and Los Angeles. Ames at 119–20. The result of this increased flight kitchen activity, which was clearly due to the acquisition, was an *increase* in new flight kitchen positions. Siebert Aff. at ¶ 7.

12. Following the merger, Continental's flight kitchens continued to cater TXI flights in Houston, Denver, and Los Angeles. By May 1983, Continental employed approximately 420 employees in its flight kitchens, a significant increase over the approximately 350 kitchen employees who had been employed as of March 1982. Findings at 3 (¶ 7); Siebert Aff. at ¶ 7.

13. William L. Scheri, the IAM's Airline Coordinator and signatory of the IAM's Proof of Claim No. 3, and Frederick Dean Ames, General Chairman of Airline District 146, both described in deposition testimony the positive effects that the merger had on Continental's flight kitchen and cabin cleaning operations. Scheri 65–67; Ames 125–28.

### F. Post-Merger Negotiations Again Focused On High Labor Costs

14. Negotiations for a combined labor agreement continued into the Spring and Summer of 1983. Continental "consistently maintained its position that it was economically unfeasible for it to continue to operate the flight kitchens in the way they were then being operated." Amended Findings of Fact and Conclusions of Law in Connection with the Debtors' Motion to Reject Collective Bargaining Agreements Relating to Mechanics and Related Employees at 6 ("Amended") (Aug. 9, 1985). Thus on July 8, 1983, Continental presented a contract proposal which provided that:

> Due to the severe economic plight of our Flight Kitchens, the Company will agree to keep the Denver and Houston Flight Kitchens open during the life of the new agreement provided the Company is able to procure food and beverage components in the most economical and efficient manner possible.

Ex. 143; Findings at 9 (¶ 27). Continental also proposed amending the contract (1) "to permit [the Company] to accomplish, in the most economical manner, work on the outside having a value in manhours not to exceed the amount of new work which the Company will bring inhouse, (2) to provide for the most economic and efficient utilization of personnel, and (3) to permit the Company to staff any cabin service stations in such a way that would permit the opening and closing of them as provided in the [March 1983 Fence Agreement.]" Amended at 8–9. This proposal would have permitted Continental to close all of its cabin cleaning stations. *Id.*

15. Pursuant to Section 5, First (b) if the RLA, the NMB, on July 13, 1983, released the parties from the mediation process and initiated the statutory 30-day cooling off period. Findings at 15 (¶ 38). On August 12, at a mediation session in Washington, D.C., Continental offered the IAM "several alternative proposals designed to

achieve cost savings but intended to give the IAM a range of options." Findings at 17 (¶ 45). These proposals specifically included a proposal to close the Houston and Denver flight kitchens, and to permit the Company to contract out all flight kitchen and cabin cleaning and service work. Findings at 64.

16. Finally, on August 13, 1983, the status quo period expired and the IAM (both former Continental and TXI employees) commenced a strike against Continental. Findings at 17 (¶ 47). Following the commencement of the strike, Continental informed all IAM employees that the former IAM contracts were no longer of any force or effect and implemented Interim Work Rules. Findings at 17–18 (¶¶ 47–48). Continental sold its three flight kitchens, closed its cabin cleaning stations, subcontracted all of this work, and furloughed approximately 700 employees who had been employed in the flight kitchens and cabin cleaning stations prior to the strike.

## CONCLUSIONS OF LAW

**A. This Court Has Jurisdiction To Decide On The Merits Debtors' Motion For Summary Judgment**

1. This Court has jurisdiction to resolve on the merits the liability issues presented by the Debtors' motion for summary judgment because the motion does not require direct interpretation or application of the statutory language of the Railway Labor Act or any other federal statute regulating interstate commerce. The question rests squarely in the bankruptcy claims adjudication process. Nonetheless, the questions raised regarding the applicability of § 157(d) to this motion for summary judgment have the potential for substantially delaying the closing of this reorganization. For this reason, the Court has determined that it will also estimate the value of the claims subject to this motion pursuant to § 502(c) of the Bankruptcy Code. Order Granting Debtors' Motion to Estimate All Contingent Unliquidated Employee Claims for Purposes of Chapter 11 Plan Confirmation Pursuant to Section 502(c) of

the Bankruptcy Code (Sept. 26, 1985). Since estimation is a "core proceeding" and a function within the jurisdiction of the Bankruptcy Court, use of the estimation procedure by this Court will allow the Debtors' Reorganization Plan to proceed without unnecessary or costly delay to the Debtor or creditor groups who may have reached agreement relative to debt repayment. The estimation procedure can, however, be simplified by resolution of the summary judgment issues now on file by the Court's review of undisputed facts and facts previously established in the case, and application of the appropriate law.

2. Furthermore, this Court rejects the IAM's contention that its $321,000,000 claim for LPP benefits must be resolved through binding arbitration before an arbitrator and that this Court is without jurisdiction to consider this claim.

Bankruptcy Courts clearly have jurisdiction to decide all claims against an estate. 28 U.S.C. §§ 1334(a); 157(a), (b)(1), (b)(2)(B). The Bankruptcy Reform Act of 1978

[S]ignificantly expands the jurisdiction of bankruptcy courts and is based on the notion that to protect the positions of both the bankrupt and its creditors, bankruptcy actions should not be subject to unnecessary delay and all claims and issues relevant to such actions should be resolved in one expeditious proceeding.

*Zimmerman v. Continental Airlines,* 712 F.2d 55, 56 (3d Cir.1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984).

3. Notwithstanding the express terms of these jurisdictional provisions, the IAM contends that Congress, in the Federal Aviation Act, directed that LPP disputes be decided exclusively by the Civil Aeronautics Board ("CAB"). Contrary to the IAM's contention, LPPs are not statutorily mandated. "No statute has ever required imposition of LPPs in air carrier mergers or route transfers." *Braniff Master Executive Council v. CAB,* 693 F.2d 220, 227 (D.C.Cir.1982); *see Midway-Air Florida*

*Acquisition Show-Cause Proceeding,* Order 85-4-3 (Apr. 1, 1985) at 6. Since there is no specific statutory authority for the imposition of LPPs, it follows that there is no specific statutory authority for the arbitration provision contained in § 13(a) of the LPPs. Here, of course, the CAB imposed LPPs in August 1981 in conjunction with the acquisition of Continental by Texas International and Texas Air. Normally, under the CAB's standard LPP provisions, disputes regarding the applicability of LPPs were referred to arbitration. *See Wallace v. CAB,* 755 F.2d 861, 863 (11th Cir.1985); *Pan American World Airways, Inc. v. CAB,* 683 F.2d 554, 556 (D.C.Cir. 1982).

4. However, where claims such as the IAM's LPP claim arise in a bankruptcy proceeding, the courts have recognized that bankruptcy judges have discretion to resolve the claims even if there exists another tribunal for such resolution. *Zimmerman v. Continental Air Lines, supra,* 712 F.2d at 59–60; *In re Amalgamated Foods, Inc.,* 41 B.R. 616 (Bankr.C.D.Cal.1984); *see In re Cross Electric Company, Inc.,* 9 B.R. 408, 409 (Bankr.W.D.Va.1981).

5. Citing *Matter of Gary Aircraft Corporation,* 698 F.2d 775 (5th Cir.) *cert. denied,* 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), the IAM argues that bankruptcy courts do not have "absolute" discretion to decide claims, and that this Court should defer the IAM's LPP claim to arbitration for liquidation. The IAM's reliance on *Matter of Gary Aircraft* is misplaced.

In that case Gary Aircraft Corporation ("Gary") and the United States entered into contracts which contained a standard disputes clause establishing a hierarchy for resolving disputes. The second level provided for review by the Armed Services Board of Contract Appeals ("ASBCA") and the third level for review by the Court of Claims. Gary filed claims under the contracts for additional costs caused by government changes in the contracts. Gary filed a bankruptcy petition under the Bankruptcy Act of 1898, while the matter was pending before the ASBCA. The

government filed a bankruptcy claim under the contracts against Gary. "The only substantial asset Gary had was its claim against the government" which, together with the government's claim, the bankruptcy court proceeded to value in a 383 page decision. 698 F.2d at 777. The government argued that the bankruptcy court should have deferred Gary's claim and its own claim to the ASBCA for liquidation.

The Fifth Circuit, after balancing the policies underlying the Bankruptcy Act of 1898 and government contract dispute resolution, concluded that the bankruptcy court should have deferred these claims for the purpose of liquidation to the ASBCA. The court relied on five factors in reaching this result: (1) deferring to the ASBCA "would not impair the primary goal of bankruptcy—requiring satisfaction of all [bankruptcy] claims" in a central forum; (2) government contract law is "technical and esoteric"; (3) there are specialized tribunals created by Congress which are "designed specifically to resolve government contract disputes"; (4) government contract disputes may include claims by both parties; thus, without deferral the same dispute might have to be litigated twice; and (5) Congress endorsed ASBCA's in recent legislation. 698 F.2d at 783–84.

■ At least four of these factors are inapplicable in this case. First, although deferral of the IAM's $312,000,000 LPP claim might not impair the goal of requiring satisfaction of this claim in this Court, it would seriously impair the claims and interests of other creditors. Such was not the case in *Gary* where the only asset of the bankrupt's estate consisted of a contractual claim against the United States government. Where resolution of a claim could "affect the amount, existence and priority of claims to be paid out of the general funds, and, thus involve the interests of other creditors," courts have held that a bankruptcy judge does not abuse his discretion in refusing to compel arbitration of such a claim. *In re F & T Contractors, Inc.,* 649 F.2d 1229, 1232 (6th Cir.1981); *see Johnson v. England,* 356 F.2d 44, 51–52

(9th Cir.), *cert. denied,* 384 U.S. 961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966). Here a decision by an arbitrator favorable to the IAM would affect the amount of funds available to other creditors. Because "[p]rotection of general creditors is a major function of … bankruptcy proceedings," submission of the IAM's claim to arbitration would be particularly unsound since Continental's creditors have not consented to arbitration and would have no right to participate in the arbitration process. 649 F.2d at 1233 n. 7; 356 F.2d at 52.

Second, there is nothing technical and esoteric about LPP law. Here the sole question presented is whether Continental's closing of its flight kitchens and cabin cleaning stations was "due to or resulting from" the 1981 acquisition of Continental by Texas International and Texas Air. Resolution of this question merely involves a determination of causation, a matter routinely decided by a bankruptcy court. Nothing involving this claim is beyond the competence of this Court. This is particularly the case here in light of the total absence of any evidence to support the IAM's claim.

Third, unlike the ASBCA in ·*Gary,* there are no specialized tribunals designed specifically to resolve LPP disputes. Rather, absent bankruptcy, the IAM's LPP claim normally would be referred to an arbitrator who would not be familiar with the facts in this case and who might not even be familiar with the airline industry generally. This Court, on the other hand, is intimately familiar with the parties' extended bargaining history relating to Continental's closing of its flight kitchens and cabin cleaning stations. Further, Continental's motion is based in large part on this Court's previous findings and conclusions. Relitigation of these findings and conclusions before an arbitrator would be duplicative and inefficient. Simply, this Court is far better equipped to resolve the IAM's LPP claim than an arbitrator would be. *See In re Amalgamated Foods, Inc., supra,* 41 B.R. at 617, 619 (debtor need not submit ERISA claims to arbitration since bankruptcy claims process adequate to resolve claims).

Fourth, unlike government contract disputes and the situation in *Gary,* Continental does not have related claims against the IAM which might require relitigation of the same issues in another forum. Last, there is no indication that Congress has endorsed the arbitration procedure contained in the LPPs.

In sum, application of the factors relied on by the Fifth Circuit in *Gary* to this case compels the result that this Court should decide Debtors' motion on the merits and need not defer the IAM's LPP claim to arbitration.

6. Similarly, the IAM's reliance on *Nathanson v. NLRB,* 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952), *Smith v. Hoboken Railroad Co.,* 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946), and *Order of Railway Conductors of America v. Pitney,* 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946) is misplaced. These cases merely stand for the proposition that where Congress has specifically provided for a specialized tribunal to decide "intricate and technical" matters, a bankruptcy court normally should defer such matters to the tribunal. 326 U.S. at 567. Here, Congress has not committed LPP disputes to a specialized tribunal and, indeed, the Federal Aviation Act does not even mention LPPs. Moreover, the IAM's claim does not involve "intricate and technical" issues. *See In re Amalgamated Foods, Inc., supra,* 41 B.R. at 618 (*Nathanson v. NLRB* does not require bankruptcy court to defer claim under ERISA to statutory arbitration procedure).

7. Further, *Gary* can be readily distinguished from this case in that *Gary* was decided under the 1898 Bankruptcy Act. By contrast, the 1978 Act, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, governs the disposition of the IAM's claim. The 1978 Act, as previously noted, significantly expanded bankruptcy subject matter jurisdiction:

[The 1978 Act] evidenced a strong Congressional or federal policy in favor of the newly created bankruptcy court hav-

ing jurisdiction which is sufficiently broad to promptly and expeditiously hear and determine all controversies involving matters of law, equity and even admiralty.

*In re Cross Electric Company, Inc., supra,* 9 B.R. at 410; *see Zimmerman v. Continental Airlines, supra,* 712 F.2d at 56. The Bankruptcy Amendments and Federal Judgeship Act of 1984 did not detract from bankruptcy subject matter jurisdiction. Rather, the 1984 Act merely allocates the exercise of that jurisdiction between the district court and the bankruptcy court. 28 U.S.C. § 1334; *see* 1 Collier on Bankruptcy ¶ 3.01 at 3–19 (15th ed. 1985); *Carlton v. BAWW, Inc.,* 751 F.2d 781 (5th Cir.1985).

8. Bankruptcy courts which have considered *Gary* generally have refused to defer claims to another forum. *See In re Amaglamated Foods, Inc.,* 41 B.R. 616 (Bankr.C.D.Cal.1984); *Matter of Page-Wilson Corporation,* 37 B.R. 527 (Bankr.D. Conn.1984); *In re Compton Corporation,* 40 B.R. 880, 884 (Bankr.N.D.Tex.1984).

■ 9. Finally, unlike the 1898 Bankruptcy Act under which *Gary* was decided, the 1978 Bankruptcy Reform Act requires the bankruptcy court to estimate contingent or unliquidated claims where liquidation of the claim would unduly delay closing of the case. 11 U.S.C. 502(c); *Matter of Brints Cotton Marketing, Inc.,* 737 F.2d 1338, 1340–41 (5th Cir.1984); *In re Curtis,* 40 B.R. 795, 801 n. 7 (W.D.La.1984); 3 Collier on Bankruptcy, ¶ 502.03 at 502–74–75 (15th ed. 1985); *In re Nova Real Estate Investment Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va.1982). Accordingly, even if this Court did not have jurisdiction to decide Continental's motion for summary judgment, the Court is required to estimate the value of the IAM's claim. *See* Order Granting Debtors' Motion To Estimate All Contingent Unliquidated Employee Claims For Purposes Of Chapter 11 Plan Confirmation Pursuant To Section 502(c) Of The Bankruptcy Code (Sept. 26, 1985).

10. Section 502(b)(1), 11 U.S.C. § 502(b)(1), provides that a claim against an estate in bankruptcy is to be disallowed if such claim "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

## B. LPPs Apply Only To Direct Employment Consequences Of A Merger

■ 11. By their own terms, LPPs were not created to insure employees against any and all economic changes or conditions that in some way adversely affect their employment. Rather, as the LPPs expressly state in § 1, their application is

[T]o be restricted to those changes in employment due to and resulting from such acquisition. Fluctuations, rises and falls, and changes in volume or character of employment brought about by other causes are not covered by or intended to be covered by these provisions.

Similarly, §§ 4, 5 and 8, which provide for a displacement allowance, a dismissal allowance, and a moving allowance respectively, each limits benefits to employees who were adversely affected "as a result of such acquisition."

■ The limitation is inherent in the narrow scope of authority under § 408 of the Federal Aviation Act, 49 U.S.C. § 1378, which the CAB has interpreted to permit the imposition of LPPs as a condition of merger approval if such conditions were found to be "in the public interest." General employee welfare is not an element of the public interest within the statutory framework of the Federal Aviation Act; labor factors may be considered only as they affect the stability of air transportation. *Kent v. CAB,* 204 F.2d 263, 265 (2d Cir.), *cert. denied,* 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953); *Midway-Air Florida Acquisition Show Cause Proceeding,* DOT Order 85–4–3 at 7 (1985).

12. The CAB consistently held that LPPs were intended to cover only changes in employment which are "fairly attributable to the merger." *Allegheny-Mohawk*

*Merger*, 59 C.A.B. 19, 36 (1972). Historically, the only changes which the CAB considered "fairly attributable" to a merger were those stemming from the combination of work forces and the consequent reduction in duplicative functions. LPPs were meant to alleviate the particular effects of the merger itself, such as abandonment of duplicative routes, consolidation of facilities, or the unique problems of putting together two work forces, in recognition of the fact that "[i]n merger cases there are inherent problems with duplicative work and the integration of seniority lists ..." *Aloha Airlines Control by IASCO*, CAB Order 78–6–208 at 15; *see Acquisition of Air West, Inc. by Hughes Tool Company*, 53 C.A.B. 32, 44 (1969); *Flying Tiger Corporate Reorganization*, 54 C.A.B. 699, 703 (1970); *Airlift-Slick Employee Integration*, 48 C.A.B. 958, 960 (1968); *Alaska International Air, Inc., Acquisition of Great Northern Airlines, Inc.*, C.A.B. Order 80–8–813 at 3, 5. By contrast, LPPs are not justified and are not imposed at all where there is no concern about duplicative routes and facilities or redundant work forces. *Aloha Airlines*, CAB Order 78–6–208 at 15.

In arguing that there is evidence to support its claim, the IAM contends that "it made business sense" for Continental to close its flight kitchens and cabin cleaning stations, and that these closings were the result of Texas International's "operational philosophy." The IAM therefore appears to argue that the closing of the flight kitchens and cabin cleaning stations was the result of a change in management policy or operating methods. However, the law is well settled that LPPs were designed only to cover changes in employment that flow directly from a merger or acquisition, and never were intended "for the purpose of protecting employees against consequences of mere changes in management policy, company organization, or operating methods." *Hughes Tool Company, supra*, 53 C.A.B. at 44. *Accord, North Atlantic Route Transfer Case*, 12 C.A.B. 124, 130 (1950).

Finally, the IAM claims that where a merger is a factor in employment changes, employees are entitled to LPPs. Here, even assuming the existence of evidence showing that the merger was a factor in the closing of the flight kitchens and cabin cleaning stations, this Court would reject the IAM's position. As this Court has already found:

> "The LPPs do not require a carrier to pay a dismissal allowance where the merger is only one of several factors creating the loss."

\*    \*    \*    \*    \*    \*

Thus, under the applicable CAB precedent it is not enough that the acquisition is simply "a cause" of the bankruptcy; it must be a "sufficiently important cause to bring the LPPs into play."

Uncontested Facts And Conclusions Of Law With Respect To Order Granting Debtors' Motion For Summary Judgment On ALPA's Claim For Labor Protective Provisions at 16 (Sept. 10, 1985) citing *Pan Am Acquisition of, Control of and Merger with National Airlines*, CAB Order 83–5–99 at 15, *aff'd sub nom. Wallace v. CAB*, 755 F.2d 861 (11th Cir.1985).

13. Contrary to the IAM's suggestion, Judge Kane did not impose LPPs in response to arguments opposing Texas International's bid. Prior to the time of his decision, Texas International voluntarily accepted LPPs. *See* CAB Order 81–5–151. Moreover, Judge Kane rejected ALPA's proposal that special LPPs should be adopted to forestall the alleged consequences of Texas International's management policies and operating methods. Specifically, ALPA proposed that "the burden be placed on the company to establish that changes in employment were not caused by the acquisition and that the new carrier be compelled to honor previous collective bargaining agreements." Order 81–10–66 at 14. Judge Kane's refusal to adopt this standard was subsequently affirmed by the CAB.

## C. Continental Is Entitled To Summary Judgment Because The IAM Has Failed To Show The Existence Of Any Genuine Issue Of Material Fact

14. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be entered in favor of a moving party if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Alladin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1112 (5th Cir.1979); *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872–73 (5th Cir.1978); *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 937 (5th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967).

15. The IAM has presented *no* admissible evidence, either by affidavit, deposition testimony, or answers to interrogatories to support its position, notwithstanding the fact that it has had since April 30, 1985 to obtain such evidence. Moreover, the IAM has failed to present the affidavit contemplated by Rule 56(f) showing why it cannot "present by affidavit facts essential to justify [its] opposition." Fed.R.Civ.P. 56(f).

16. The uncontroverted evidence, including this Court's express findings, demonstrates that Continental's decision to close its flight kitchens and cabin cleaning stations was based solely on economic factors that were completely unrelated to the acquisition and merger. Thus, as to Continental's flight kitchens, the uncontroverted evidence shows that Continental had proposed closing its kitchens in an effort to reduce its escalating labor costs in all contract negotiations with the IAM since 1971. Continental's pre-acquisition September 1981 opener merely reaffirmed the Company's consistent position, made more urgent by the advent of airline deregulation in 1978, that the flight kitchens would have to be closed if the IAM failed to agree to meaningful wage rate and work rule concessions designed to reduce substantially the Company's labor costs and make the flight kitchens economically viable. Simply, as this Court found:

> Continental's flight kitchens were hampered from operating efficiently because of the restrictive work rules which had been developed and the higher wage rates and benefit levels which far exceeded those paid by contract caterers such as Marriott, Dodds, etc.

Findings at 10 (¶ 29). Despite the need for concessions, the IAM never agreed to any significant concessions regarding the flight kitchens.

17. Further, in light of the fact that Texas International *did not operate* flight kitchens, there can be no argument that the Continental-TXI merger resulted in duplicative flight kitchen facilities or redundant work forces. Rather, the evidence shows that the merger resulted in increased kitchen activity and an increase in the number of flight kitchen jobs. None of the factors historically relied on by the CAB in considering whether to impose LPPs are present in this case with respect to Continental's flight kitchen employees.

18. Similarly, the uncontroverted evidence shows that Continental's decision to close its cabin cleaning stations was based solely on economic factors that were completely unrelated to the acquisition and merger. Thus, since at least September 1981 Continental had been seeking to reduce its cabin cleaning costs and, in fact, had proposed in 1981 modifying the Scope Article to provide the Company with the right to "create, delete or relocate any and all work in classifications covered by [the 1971 Continental-IAM] Agreement existing or future stations served by the Company." This proposal would have allowed Continental to close all of its cabin cleaning stations unilaterally.

19. Further, as with Continental's flight kitchens, there was little, if any, duplicative

cabin cleaning work which resulted from the merger. Thus, Houston and Denver were the only two locations where both Continental and TXI maintained cabin cleaning stations. However, there is no evidence that any cabin cleaning employee in Houston or Denver was adversely affected by the merger. Nor is there any evidence that any cabin cleaning employee at any other location was adversely affected.

20. Simply, as this Court expressly found, Continental closed its flight kitchens and cabin cleaning stations because "it could contract this service from third parties substantially cheaper than it could perform them with IAM employees under the terms of the IAM collective bargaining agreements[s]." Memorandum of Authorities Authorizing Rejection of Airline Pilots Association Collective Bargaining Agreements at 47 n. 6 (Aug. 17, 1984). More specifically,

> [T]he provisions of the IAM contracts relating to flight kitchen and cabin cleaning operations ... required Continental to pay skilled wage rates to relatively unskilled employees performing operations not requiring a skill. In addition, these contract provisions ... contain terms which provide for inflexibility and inefficiency of operation and which are clearly onerous and burdensome. Continental could not compete in the existing market place if it had to continue to pay compensation so substantially in excess of its effective competition. Continental could and did contract out this work to third parties at substantial savings. Thus it is clear that the wage rates and working condition provisions pertaining to these operations were materially in excess of those commanded by the market place.

Findings at 74.

21. Mr. William Scheri's testimony vividly demonstrates the total absence of evidence to support the IAM's LPP claim:

> Q. Mr. Scheri, are you familiar with the LPP order entered by the CAB in 1981?

> A: Yes, I am.

Scheri 71.

> Q. [D]o you believe that the closing of the flight kitchens was related in any way to the acquisition of Continental by Texas International?

> A. I really don't know. You'd have to ask management. I don't know what their reasoning was for closing the kitchens. I know one thing, they didn't have a right to do it under our collective bargaining agreement, and this is being pursued in the courts.

Scheri 75.

> Q: Do you believe that the closing of the cabin cleaning stations in August 1983 was in any way related to the acquisition of Continental by Texas International?

> A: I have no idea. That's something management would have to answer for you.

> Q: Do you have any information at all as to why the cabin cleaning stations were closed in August of 1983?

> A: I guess they just made a determination to close it and farm our work out.

> Q: Do you have any reason as to why that was done?

> A: No, I don't.

Scheri at 76.

> Q: [W]hat is the relationship between the dismissal of the cabin cleaning and service employees and the acquisition of Continental by Texas International?

> A: That's what they're obligated to pay when they dismiss people within a period of time.

> Q: Regardless of the cause of the dismissal?

> A: That's correct, and because we always take a position that it's always acquisition or merger related. Any time you put two companies together, any action that takes place as a

result of combining companies and people are affected.

Scheri at 82–83.

Q: Is it your testimony that the only information that the IAM has to show that the employment changes set out in paragraph six were due to and resulting from the acquisition are the number of people in the unit?

A: I believe that's true, as published by the company in October of '82.

Scheri 134.

Q: You don't know why those people were dismissed, do you?

A: No, I have no idea. I've never seen anything in writing from the carrier other than that the work was farmed out immediately on August 12 to Marriott who is a dining service.

Q: So you have no idea what the cause of those dismissals were, do you?

A: No, other than the company telling me verbally over the table that they farmed that work out to Marriott because of the lesser rates of pay, as I explained this morning. It's above minimum rates of pay that they're paying people at Marriott.

Q: And that is the only information that the IAM has with respect to the LPP claims, is that correct?

A: What do you mean the only claim? I don't understand.

Q: The only information, the information that you just stated.

A: To my knowledge, that's correct, yes.

Scheri 135–136.

Thus, the only basis for the IAM's claim seems to be that the furloughs occurred after the merger, and that therefore they were caused by the merger. Such a position is clearly not sustainable as a matter of law.

22. Because this Court is persuaded that Continental is entitled to judgment as a matter of law, summary judgment is appropriate and will be granted. *See* Fed. R.Civ.P. 56(e). For the foregoing reasons,

the IAM's claim for LPP benefits will be disallowed in its entirety.

23. This Court further rules that the value of the IAM's claim for LPP benefits is estimated at zero pursuant to 11 U.S.C. § 502(c) based on the Court's conclusion that this claim is without merit.

These Findings of Fact and Conclusions of Law are hereby incorporated into and made a part here of by reference in the Order entered by this Court adjudicating this issue.